Richard D. McCune (SBN 132124)
rdm@mccunewright.com
Steven A. Haskins (SBN 238865)
sah@mccunewright.com
MCCUNE WRIGHT AREVALO LLP
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

*Attorneys for Plaintiff and the Putative Class*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY BINNELL, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>ST. JOSEPH HOSPITAL ORANGE, ST. JOSEPH HEALTH, PARATUS PARTNERS LLP, and DOES 1-10, inclusive,<br><br>    Defendants. | Case No.:   8:20-cv-00447-DOC-ADS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

-1-

FIRST AMENDED CLASS ACTION COMPLAINT

# INTRODUCTION

1.    One of California's most pressing economic problems over the past two decades has been the skyrocketing cost of healthcare to California citizens.  One analyst recently calculated that total US healthcare spending reached $3.5 trillion in 2017, accounting for 17.9% of the nation's gross domestic product (or GDP).  What is more, healthcare spending is expected to grow at an average rate of 5.5% per year until 2027, a rate that would cause healthcare spending to reach $6 trillion and account for nearly 20% of GDP in only seven short years

2.    These statistics continue a permanent and irreversible trend that has hit Californians particularly hard.  Healthcare expenses borne by California workers increased 68% between 2008-1018, while average wage growth for the same period increased just 16%.  The result is that Californians, like most Americans, are spending increasing amounts of their monthly paychecks on premiums and deductibles, crowding out other necessities such as food and shelter.  What is more, industry analysts project healthcare spending to increase at rates far greater than any measure of economic growth, wage growth, and even inflation over the same time period.  Thus, healthcare spending will likely continue growing at a pace requiring Americans to spend ever larger amounts of their base income merely to maintain their health and well-being.

3.    Given the increasing costs of healthcare relative to economic and wage growth, it should come as little surprise that the relative burdens of America's increasingly expensive healthcare system fall disproportionately on those who have the least.  26% of U.S. adults say that they or someone in their household had problems paying medical bills in the past 12 months.  And while that percentage leaps to 53% among those that lack insurance, having insurance is no silver bullet.  Even 20% of insurance holders report having difficulty paying their medical bills.

4.    Unsurprisingly, approximately 40% of those who report problems paying their medical bills are those with annual household incomes below $50,000.  And 47% of those who report such problems report that they are disabled, making it more difficult for

FIRST AMENDED CLASS ACTION COMPLAINT

them to work to pay their debts.  Moreover, the vast majority of those who report struggling to pay their medical bills report that their financial plight has been caused by a surprise, one-time, or short-term medical expense, such as a single hospital stay or unexpected treatment for an accident, many in circumstances where they are victims of coincidence and chance.

5.    It is similarly unsurprising, then, that accident victims find themselves at increased risk of economic hardship as a result of receiving medical care after an unfortunate accident.  Such victims find themselves first in the emergency room, often being treated for serious and life-threatening injury, then may undergo a lengthy hospital stay for further treatment and ongoing evaluation.  Cost concerns are sublimated in the short-term for life-saving care, but ultimately the bill comes due and must be paid.

6.    Unfortunately, healthcare providers and their agents know this and use this information to their patients' detriment.  When providers contract with government insurance programs such as Medicaid and Medicare, they agree to collect only the amounts they have contractually agreed to obtain through their agreements with those programs.  The law forbids so-called "balance billing," the industry term for collecting the provider's contractual reimbursement, then billing the patient for the remainder of what the hospital unilaterally decides should be the "true" charge for its services.

7.    Government programs such as Medicare and Medicaid provide substantial sources of revenue to providers such as St. Joseph's.  These institutions thus have the leverage to negotiate reasonable rates for receiving reimbursement for the costs of patient care.  This is leverage that most individuals do not have, particularly in the case of accident victims, who are often whisked to the hospital under life-threatening circumstances in conditions where they are unable to make informed choices about their care.  Providers then leverage this inherent disparity in bargaining power against their patients.  In particular, hospitals and other healthcare providers identify circumstances in which patients are entitled to judgments from tortfeasors, then assert false liens against those settlements.  Providers are not actually interested in pursuing these alleged liens

FIRST AMENDED CLASS ACTION COMPLAINT

because they have no legal basis to do so. Instead, the alleged liens are merely threats used to bully patients into negotiating away their rights to hard-won settlements.

8.    Plaintiff's experience here has become an all-too-common one in America's increasingly rapacious healthcare system. She went to the hospital after suffering ghastly injuries in an incident where she was struck by an automobile while walking across the street. Plaintiff suffered through a difficult recovery for several weeks, and then faced months and years of additional therapeutic recovery. All of this had a predictable effect on her quality of life and well-being, making her ability to care for herself more difficult while increasing her incidental cost of living.

9.    It is at this juncture where Defendants ruthlessly game the rules in predatory fashion. Here, Defendants exploit victims to reap tens of thousands of dollars of undue profits. When the federal government implemented the Medicare system in 1965, Medicare was the primary source of payment for all a member's medical claims. This changed in 1980, when Congress passed the Medicare Secondary Payer Statute. Concerned about the effect of increasing healthcare costs on the Medicare system's long-term viability, the Secondary Payer Statute provided that Medicare would act as a secondary payer in cases where a liability insurer "can reasonably be expected to pay" in a certain case. The law intends that a third-party liability insurance policy should act as the primary source of payment, but the law does not contemplate treating Medicare recipients in these circumstances as if they had no insurance at all.

10.    To maximize the pressure on victims like Plaintiff, Defendants stretch the law far past its breaking point. Defendants assert liens for amounts many times above the amounts they would be entitled to obtain from Medicare, or even the third-party liability insurance policy held by the tortfeasor. These are amounts that the law never intended a Medicare recipient to pay. And Defendants refuse to apply for reimbursement to Medicare as the secondary payer, because they have already marked up the costs of their care many times over previously-established Medicare reimbursement schedules. Indeed, to do so would merely further highlight Defendants' practice of charging accident victims

-4-

like Plaintiff many times more than other Medicare recipients.  The irony is that Defendants in these cases charge tens or hundreds of thousands of dollars more in amounts that were never agreed to by the victim, and which medical networks such as Medicare and private insurance services have already rejected as exorbitant and unreasonable.

11.    Then, Defendants use their inflated liens as leverage to insert themselves into victims' disputes with their tortfeasors, with the purpose of maximizing their profits while delaying victims' recoveries and increasing their hardships.  Defendants ultimately issue these bad faith liens to obtain payments they are not otherwise entitled to receive.

12.    The effect of Defendants' manipulation is to deprive Medicare recipients like Plaintiff of any of the benefits of their health insurance—at the time when they need their insurance most.  Through no fault of their own, accident victims are stranded with hundreds of thousands of dollars in liens that shouldn't exist at all.  And all of this at a time when access to, and affordability of, healthcare services is of nationwide concern. At the signing ceremony for the first Medicare law in 1965, President Johnson declared "No longer will illness crush and destroy the savings that [older Americans] have so carefully put away over a lifetime so that they might enjoy dignity in their later years." Defendants not only act contrary to law, but to the fundamental purposes of the Medicare system.

13.    There is a simple descriptive word for this when mobsters and racketeers use leverage in this way:  Extortion.  Defendants are specifically engaged in a business practice against Plaintiff, and generally against Californians similarly situated to Plaintiff, from which they use similar bad faith tactics as those described in this First Amended Complaint ("FAC") to reap millions of dollars in unwarranted gains from Californians— many of them elderly and victims of accident or crime, like Plaintiff.  The Court must put a stop to this bad faith and unfair practice that revictimizes Medicare recipients a second time.

FIRST AMENDED CLASS ACTION COMPLAINT

## **VENUE AND JURISDICTION**

14.     Plaintiff Nancy Binnell is an individual currently residing in Laguna Niguel, California.

15.     Defendant St. Joseph's Hospital—Orange is a hospital operating at 1100 West Stewart Drive, Orange, California, 92868.  Plaintiff received medical care at St. Joseph's as previously described in this FAC.

16.     Defendant St. Joseph Health is an integrated healthcare delivery system with regional operations in Northern California, Southern California, and Texas/New Mexico.  Upon information and belief, St. Joseph's Hospital-Orange is part of the St. Joseph's Health system operating within the Southern California region.  St. Joseph's has over 119,000 employees and advertises the "comprehensive range of services" it offers across the Western United States, with facilities in states as far-flung as Alaska and Texas.  St. Joseph Health operates 51 hospitals, several urgent care centers, and over 800 physician clinics as a result of a long series of mergers and acquisitions since its founding in 1982.  Only last year, St. Joseph's Health acquired the College Station Medical Center, a medical provider associated with the Texas A&M Health Network, increasing St. Joseph's reach into the Texas market.

17.     Defendant Paratus Partners LLC ("Paratus") is a debt collection company operating in several states, including California.  Paratus is incorporated in the State of Delaware and registered for business in California at 3020 Saturn Street Suite 100, Brea, California, 92821.  Paratus bills itself as the "preeminent provider of revenue cycle management services in the complex first and third party liability ("TPL") claims space."  Paratus advertises that "on average we drive 200% more revenue from a hospital's TPL portfolio than the typical hospital would.  The improvement we drive on per patient profitability ranges all the way up 50% per annum, depending upon a number of facility specific factors."

18.     Paratus further bills itself as an expert in what it calls "Medicare Secondary Payer" or "MSP" compliance.  Paratus advertises that "leveraging the power of a well-

FIRST AMENDED CLASS ACTION COMPLAINT

defined claims process of a trusted partner, vested in [sic] the performing the claims management process in compliance with MSP while improving profitability, is a strategic necessity." Paratus promises hospitals that "everything we do is designed to avoid unnecessary conflict and protect the integrity of your relationship with, and reputation in, the community you serve."

19.    The St. Joseph's entities are so interwoven that they act and operate as a single entity. Plaintiff is presently unable to confirm which of St. Joseph's other wholly-owned subsidiaries and/or affiliated companies are liable for the claims asserted herein. Discovery will allow Plaintiff to proceed with naming additional St. Joseph owned and/or affiliated companies as circumstances warrant. Other persons and entities, Does 1-10, whose identities are presently unknown to Plaintiff participated in the events alleged herein which give rise to Plaintiff's claims.

20.    At all times herein mentioned, each of the Defendants hereinabove was the agent, servant employee, partner, alter ego, aider and abettor, co-conspirator and/or joint venture of each of the remaining Defendants named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

21.    This Court has jurisdiction over the federal claims asserted in this FAC pursuant to 28 U.S.C. § 1331, which provides that the district courts have "original jurisdiction" over all civil actions arising under federal law. This Court has supplemental jurisdiction over all state-law claims asserted herein pursuant to 28 U.S.C. § 1367.

22.    This Court is the proper venue for this lawsuit because all defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district. *See* 28 U.S.C. § 1391.

## SPECIFIC FACTUAL ALLEGATIONS

23.    On May 17, 2018, Plaintiff was walking her dog near her home in Laguna Niguel, California, when she was struck and injured by a Sports Utility Vehicle driven by

FIRST AMENDED CLASS ACTION COMPLAINT

Essam Ayad.  Plaintiff was transported after the accident to Mission Medical Center and not discharged until June 2, 2018.  When she arrived, doctors detailed a battery of injuries, including traumatic brain injury, fractured right ankle, cervical and thoracic spine fractures, rib fractures, scalp and forehead lacerations, disfigurement, scars, bruising, back pain, and emotional distress.

24.    Plaintiff is over the age of 65, and therefore covered through the federal Medicare program administered by the Department of Health and Human Services.

25.    Medicare enters into service contracts with healthcare providers to provide medical services at certain pre-agreed costs.  These costs are generally lower than the inflated rate the hospital would otherwise charge if the patient did not have insurance at all.  Medical practitioners that register with Medicare as participating providers agree to "accept assignment" for all Medicare patients, meaning that they (1) agree to accept Medicare's fee-schedule amount as payment-in-full for a given service and (2) agree to collect Medicare's portion directly from Medicare, rather than the patient.  Only a small percentage of providers registered with Medicare are so-called "non-participating providers," and only non-participating providers can bill the beneficiary directly, including Medicare's share.  Non-participating providers can bill Medicare patients slightly more than participating providers, and total beneficiary liability is limited to a fraction of Medicare's regular fee schedule amount.

26.    Once a provider bills Medicare, the provider must withdraw all claims or liens.  This applies even if Medicare did not pay the claim or if the provider refunded the payment received back to Medicare.  A hospital cannot submit its bills to Medicare for reimbursement and attempt to assert a lien against the patient to collect the same bills.

27.    Because millions of Americans are insured through the Medicare program, Medicare administrators generally negotiate significantly lower reimbursement rates than private insurance companies, and the negotiated reimbursement rate is much lower than the inflated rate providers unilaterally impose as their alleged cost of services.

FIRST AMENDED CLASS ACTION COMPLAINT

28.    From this gap between the approved Medicare reimbursement rates and the provider's self-enriching, inflated cost of providing care emerges Defendants' scheme against Plaintiff and others similarly situated to her, which is designed to obtain additional funds Defendants have no legal entitlement to receive. Indeed, this scheme is a case study in the predatory leveraging of disparate bargaining power against helpless consumers.

29.    Plaintiff was treated at Mission Medical Center (operated by St. Joseph) and released to recuperate. Approximately three months later, Mr. Ayad's third-party insurance policy was tendered with a maximum payment of $100,000 per incident. Defendants therefore knew at this time that the liability policy tendered by the third-party was capped at $100,000.

30.    Though Defendants knew this fact, they decided to pick and choose the services they would submit to Medicare for reimbursement. Defendants submitted very few of those services for Medicare reimbursement and decided not to seek reimbursement for approximately $190,000.[1] Defendants thought that by pursuing this strategy, they could bypass the relatively lower reimbursements they had contracted with Medicare and effectively bill Plaintiff for the entire amount of the bill.

31.    Therefore, on August 17, 2018, several months after being discharged from the hospital, Plaintiff received a document entitled "NOTICE OF STATUTORY LIEN CLAIM." In the document, Paratus explained that it was the "authorized agent" of St. Joseph Health, and gave supposed notice that St. Joseph Health was claiming to impose liens on any damages that the patient might recover from the party that injured Plaintiff. The sum total of the asserted liens was approximately $190,000, far above the negotiated reimbursement rates the hospital had negotiated with Medicare—and also far above the

---

[1] Plaintiff does not challenge any of the services for which Defendants submitted reimbursement to Medicare, nor any reimbursement Defendants received from Medicare for those services. Plaintiff only challenges the liens Defendants issued to Plaintiff, bypassing Medicare altogether.

FIRST AMENDED CLASS ACTION COMPLAINT

$100,000 third-party liability policy that had been tendered as a result of Plaintiff's accident.

32.    Federal law forbids medical providers registered for Medicare services to balance bill patients for sums not reimbursed by Medicare. Defendants have no legal right to claim any sums above and beyond the customary and usual Medicare reimbursement rate for the services provided to Plaintiff, or other similarly situated patients.

33.    Likewise, the Secondary Payer provisions apply only if "payment has been made or "can reasonably be expected to be made" under an "automobile or liability insurance policy or plan."  If payment cannot "reasonably be expected to be made," then Medicare's Secondary Payer provisions do not apply, and Medicare is the primary payer.

34.    Defendants' assertion of these liens against Plaintiff turns the entire system on its head.  Plaintiff is a Medicare participant.  Plaintiff also has a supplemental Blue Cross policy to cover certain gaps in Medicare Part A and Part B coverage.  In other words, Plaintiff went to the hospital believing she was protected by the government's universal healthcare program for those over 65, and believing that she had purchased additional coverage to cover additional costs that might be incurred as a result of her care.

35.    But Defendants have taken the position that because of Plaintiff's situation, she has the equivalent of no healthcare insurance at all.  They have instead suggested that because of the $100,000 third-party liability insurance policy, Medicare was a "secondary payer," and thus Defendants could bypass Medicare altogether and instead demand from Plaintiff the entire $190,000 amount it arbitrarily billed for her services.

36.    Congress did not adopt the Secondary Payer Statute to strand Medicare participants without health insurance coverage as Plaintiff effectively has been in this situation.  In fact, Defendants got it entirely backward.  Defendants were aware that the $100,000 third-party automobile liability policy tendered after Plaintiff's accident was not going to be sufficient to cover the payments and thus payment of Defendants' excessive bills could not "reasonably be expected to be made."  Though the Secondary

Payer Statute was designed to protect Medicare's long-term financial viability, it was not designed to do so at the expense of Medicare participants victimized through no fault of their own by under-insured third parties.

37.    Defendants asserted these liens against Plaintiff not because they had any good faith basis for believing they were entitled to payment of nearly $200,000, but to create leverage to obtain an in terrorem settlement, as they hoped Plaintiff would settle these alleged liens at undue cost simply to proceed with collecting her settlement funds to help restore her post-accident lives.

38.    The assertion of these liens against Plaintiff, and those similarly situated to her, victimizes them twice.  First, when Plaintiff and those like her are injured, they are rushed to emergency and trauma rooms and face an uncertain future.  Often, their very survival is in question.  If they survive, they may—again, like Plaintiff—require lengthy hospital stays for treatment and recovery.  These stays involve not only the cost of treatment, but the potential of foregoing income and employment opportunities during their hospital stay and in the weeks or months after.  Meanwhile, victims are often left undercompensated by insufficient insurance coverage, attorneys' fees, and other incidental expenses.  As a result, it is all the more important that victims like Plaintiff receive their settlement funds as soon as possible.

39.    Defendants' scheme relies on pure leverage.  With the victim recovering from injury and often having financial problems, Defendants assert bad faith "liens" they cannot legally collect based on federal law governing Medicare-registered practitioners.  These liens are asserted not because Defendants have any expectation of filing such liens or of collecting such liens through any good faith exercise of the judicial process, but instead as leverage to extort unfair settlements of legal claims by threatening to hold up the delivery of desperately needed settlement funds to the accident victim.  In doing so, the hospital's agent—in this case, Paratus—sends vague, boilerplate letters threatening legal action without any intention of doing so.  They then use the inflated lien amounts to

FIRST AMENDED CLASS ACTION COMPLAINT

extract settlements from unwary plaintiffs who need to scramble for resources to put their lives back together.

40.    These tricks are ultimately what Paratus is advertising when it claims that it can leverage "Medicare Secondary Payer" or "MSP" compliance.  While it advertises "complex analytical algorithms" and "technology" that pinpoints problems and trends, Paratus' strategy is somewhat more mundane:  Identify parties that are in extreme need and entitled to a settlement, then interfere with the ability of those parties to obtain the needed funds by asserting false, bad faith liens, thereby effectively extorting a bad-faith "settlement" before Plaintiff can obtain what is left of the settlement fund.

41.    Upon information and belief, practices such as those alleged against Defendants have become widespread, if not commonplace.  Defendants use the specter of fake liens and potentially ruinous amounts of false and invented debt to extort innocent victims for millions of dollars every year.  This rampant misuse of power against consumers who have done nothing but end up in the wrong place at the wrong time must be prevented.

## CLASS ALLEGATIONS

42.    Plaintiff brings this action on her own behalf, and on behalf of a class of similarly situated consumers, pursuant to Federal Rule of Civil Procedure 23:

- All persons in the state of California who are Medicare recipients against whom Defendants have asserted liens above and beyond those amounts they have sought in reimbursement from Medicare.

43.    Plaintiff identifies the following sub-class of similarly situated consumers, pursuant to Federal Rule of Civil Procedure 23, and pertinent to her Fourth Cause of Action as described below (the "Sub-Class"):

- All persons in the state of California who are over the age of 65 and Medicare recipients against whom Defendants have asserted liens above and beyond those amounts they have sought in reimbursement from Medicare.

FIRST AMENDED CLASS ACTION COMPLAINT

44.     Excluded from the Class and Sub-Class are Defendants, their affiliates, employees, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the Class and/or Sub-Class definitions based on discovery and further investigation.

- **Numerosity:**  Upon information and belief, the Class and Sub-Class are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class and Sub-Class are unknown at this time, such information being in sole possession and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that at least hundreds, and potentially thousands, of persons are members of the Class.

- **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Class and Sub-Class.  These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    o   Whether Defendants asserted liens for compensation on settlement proceeds of patients that was more than allowed by law for the services provided to the patient;

    o   Whether Defendants asserted liens for compensation on settlement proceeds of patients that have a good faith basis in law;

    o   Whether Defendants asserted such liens knowing they had no legal right to collect on such liens, and no intention of actually pursuing litigation; and

    o   Whether Defendants engage in an unlawful business practice by systematically asserting bad faith liens against settlements that accident victims enter into with third-party tortfeasors.

-13-

FIRST AMENDED CLASS ACTION COMPLAINT

- **Typicality:**  All of Plaintiff's claims are typical of the claims of the Class and Sub-Class because in each case, Defendants asserted illegal and unenforceable liens against members of the Class and Sub-Class. Furthermore, Plaintiff and all members of the Class and Sub-Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiff advances the same claims and legal theories on behalf of herself and all absent Class Members.

- **Adequacy:**  Plaintiff adequately represents the Class and Sub-Class because her interests do not conflict with the interests of the Class she seeks to represent, she has retained counsel who are competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff and her counsel are well-suited to fairly and adequately protect the interests of the Class.

- **Superiority:**  A class action is superior to all other available means of fairly and efficiently adjudicating the claims brought by Plaintiff and the Class. The injury each individual Class member has suffered is relatively small in comparison to the burden and expense of individually prosecuting the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for Class members on an individual basis to effectively redress the wrongs done to them.  Even if Class members could afford the cost and delay to settlement proceeds of such individual litigation, the courts cannot.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  It also increases the delay and expense to all parties and to the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, individual Class members

-14-

can be readily identified and notified based on, Defendants' own records—namely, their records of alleged liens.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of Federal Debt Collection Practice Act)

(15 U.S.C. § 1692 *et seq*.)

45.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

46.     15 U.S.C. § 1692 recognizes the "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."  The statute further recognizes that "[e]ven where abusive debt collection practices are purely intrastate in character, they nevertheless directly affect interstate commerce."

47.     Plaintiff is a "consumer" as that term is defined in 15 U.S.C. § 1692a, in that she is "allegedly obligated" to pay a debt.

48.     Defendants individually and collectively constitute a "debt collector' as that term is defined in 15 U.S.C. § 1692a, in that they use an "instrumentality of interstate commerce or mails in any business the principal purpose of which is the collection of any debts."

49.     By claiming that Plaintiff owed a debt she does not owe, Defendant engaged in the "false representation of the character, amount, or legal status of any debt."  *See* 15 U.S.C. § 1692e.  Defendants know they are attempting to collect nonexistent and/or inflated debts to which they have no legal entitlement.

50.     By claiming that Defendants intended to attach nearly $200,000 in liens to Plaintiff's rightful property—when taking such action would have been unlawful and Defendants had no actual intent to take such action—Defendants violated the FDCPA by representing that they would seize, garnish, attach, or sell Plaintiff's property in a case where such action was not lawful and Defendants had no intention to take any such action.  *See* 15 U.S.C. § 1692e.

FIRST AMENDED CLASS ACTION COMPLAINT

51.     Defendants attempted to collect an amount of money not expressly authorized by any agreement and not permitted by law.  *See* 15 U.S.C. § 1692f.

52.     As a result of Defendants' violations, Plaintiff and the Class are entitled to damages, costs, and attorneys' fees as provided in 15 U.S.C. § 1692k, including actual damages as may be proven at the time of trial.

## SECOND CAUSE OF ACTION

### (Violation of Rosenthal Fair Debt Collection Practices Act)

(Cal. Civ. Code § 1788 *et seq*.)

53.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

54.     Plaintiff is a "person" as that term is defined in California Civil Code § 1788.2.  Plaintiff is also a "debtor" as that term is defined in the same section, in that she is "a natural person from whom a debt collector seeks to collect a consumer debt that is due and owing or alleged to be due and owing from such person."

55.     Plaintiff is a person who was the object of a collection activity arising from an alleged debt.

56.     Defendants have attempted to collect an alleged consumer debt by falsely representing that a "legal proceeding has been, is about to be, or will be instituted unless payment of a consumer debt is made."  *See* Cal. Civ. Code § 1788.13.

57.     Defendants' actions constitute a willing and knowing violation of the RFDCPA, in that Defendants know they are attempting to collect nonexistent and/or inflated debts to which they have no legal entitlement.

58.     As a result of Defendants' violations of the RFDCPA, Plaintiff and the Class are entitled to damages, costs, and attorneys' fees as provided in California Civil Code § 1788.30, including actual damages as may be proven at the time of trial.

FIRST AMENDED CLASS ACTION COMPLAINT

# THIRD CAUSE OF ACTION

## (Violation of California Unfair Competition Law)

### (Cal. Bus. & Prof. Code § 17200 *et seq.*)

59.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

60.     The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200.

61.     Defendants have engaged in unfair competition and unfair, unlawful, or fraudulent business practices by asserting illegal, unlawful, and uncollectible liens in bad faith and in contravention of federal law, California law, and public policy.  These acts have caused Plaintiff to suffer injury in fact and loss of money and/or property, in an amount to be proven at trial.  Defendants' acts of unlawful, unfair, and fraudulent competition also have caused irreparable and incalculable injury to Plaintiff, and Defendants' business practices must be enjoined as to her and to others similarly situated to her.

62.     Defendants' acts are unlawful based on their violations of the FDCPA, 15 U.S.C. § 1692 *et seq.*, and the RFDCPA, Cal. Civ. Code § 1788 *et seq.*

63.     Defendants' practice offends an established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

64.     The injuries suffered by Plaintiff and the Class members greatly outweigh any potential countervailing benefit to consumers or to competition, and they are not injuries that Plaintiff and the Class members could or should have reasonably avoided.

65.     Defendants' practice is fraudulent in that Defendants represent their entitlement to liens against third-party settlements against which they have no actual or legal claim.  Defendants know they are attempting to collect nonexistent and/or inflated debts to which they have no legal entitlement.

FIRST AMENDED CLASS ACTION COMPLAINT

66.     Plaintiff seeks to enjoin Defendants from further unlawful, unfair, and/or fraudulent acts or practices, namely, the assertion of bad faith, illegal, and uncollectible liens.

67.     Plaintiff and the Class seek to obtain restitutionary disgorgement of all monies and revenues Defendants has generated from such practices, and all other relief allowed under California Business & Professions Code § 17200 *et seq*.

## FOURTH CAUSE OF ACTION

### (Violation of Elder Abuse and Dependent Adult Civil Protection Act)

### (Cal. Welfare & Inst. Code § 15610 *et seq*.)

68.     Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

69.     Plaintiff and members of the Sub-Class are "elders" as defined by Welfare and Institutions Code §15610.27, as Plaintiff and members of the Sub-Class are 65 years of age or older.

70.     By wrongfully interfering with the rights of the Plaintiff and the Sub-Class to recover funds in bad faith, Defendants have taken, secreted, appropriated, obtained, or retained the personal property of an elder for a wrongful use and/or with an intent to defraud.

71.     Plaintiff and members of the Sub-Class each have a property right in the settlement of their case with which Defendants have interfered by use of their bad faith assertion of alleged liens.

72.     Defendants knew or should have known that their conduct was and is likely to be harmful to Plaintiff and members of the Sub-Class.

73.     As a result of Defendants' interference with Plaintiff and members of the Sub-Class, Defendants have harmed Plaintiff and members of the Sub-Class in an amount to be proven at trial.

74.     Plaintiff seeks to enjoin Defendants from further unlawful, unfair, and/or fraudulent acts or practices, namely, the assertion of bad faith, illegal, and uncollectible

FIRST AMENDED CLASS ACTION COMPLAINT

liens, with regard to those Sub-Class members and others who may be subject in the future to similar conduct.

75.    Because Defendants' acts were knowing, intentional, oppressive, and malicious in nature, Plaintiff and members of the Sub-Class are entitled to punitive damages in an amount to be proven.  Plaintiff and members of the Sub-Class are also entitled to the full cost of attorneys' fees and costs they have or will incur in bringing this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and members of the Classes, respectfully request that this Court:

a.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Classes as defined above;

b.    appoint Plaintiff as the representative of the Classes and her counsel as Class counsel;

c.    award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and members of the Classes are entitled;

d.    award pre-judgment and post-judgment interest on any monetary relief;

e.    grant appropriate temporary, preliminary, and permanent injunctive and/or declaratory relief, including, without limitation, an injunctive order requiring Defendants to cease all unfair and illegal business practices;

f.    award reasonable attorneys' fees and costs; and

g.    grant such further relief that this Court deems appropriate.

//
//
//
//

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3

Dated:  June 1, 2020

Respectfully submitted,

MCCUNE WRIGHT AREVALO, LLP

4
5
6
7

By

Richard D. McCune
Attorneys for Plaintiff Nancy Binnell,
and the Putative Class

8
9
10

## **DEMAND FOR JURY TRIAL**

11
12

Plaintiff, on behalf of herself, and all others similarly situated, demand a trial by jury on all issues so triable.

13
14

Dated:  June 1, 2020

MCCUNE WRIGHT AREVALO, LLP

15
16
17
18

By:

Richard D. McCune
Attorneys for Plaintiff Nancy Binnell,
and the Putative Class

19
20
21
22
23
24
25
26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT